# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **FRED WALFISH**, <br><br> Plaintiff, <br><br> v. <br><br> **NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY and NORTHWESTERN MUTUAL INVESTMENT SERVICES, LLC**, <br><br> Defendants. | Civ. No. 2:16-cv-4981 (WJM) <br><br><br> **OPINION** |

## WILLIAM J. MARTINI, U.S.D.J.:

Plaintiff Fred Walfish ("Plaintiff" or "Walfish") is an insurance agent who was associated with Defendants Northwestern Mutual Life Insurance Company and Northwestern Mutual Investment Services (together, "Defendants" or "Northwestern") for nearly twenty years. On August 15, 2016, Plaintiff filed a one-count putative class action complaint alleging that Northwestern's method of compensating agents violates the New Jersey Wage Payment Law ("NJWPL"). ECF No. [1]. According to the complaint, Defendants misclassified him and other insurance agents as independent contractors and deducted certain expenses from their commissions in violation of the NJWPL. *Id.* at 57–58.

After Defendants' request to brief summary judgment prior to class certification was granted, *see* ECF No. [58], the parties cross-moved for summary judgment, ECF Nos. [61] and [66] ("Motions"), on Plaintiff's individual claim. The Court has reviewed the Motions and all papers filed in support and opposition, and no oral argument was held pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

## I. FACTUAL BACKGROUND[1]

The following facts are undisputed unless otherwise noted. Defendant Northwestern Mutual Life Insurance Company is a life insurance company headquartered in Milwaukee, Wisconsin. Plaintiff's Counterstatement of Material Facts, ECF No. [66-2] ¶ 1. Defendant Northwestern Mutual Investment Services, LLC is its wholly owned broker/dealer. Riedl Tr. at 6–8. Defendants' core business is underwriting, issuing, and servicing insurance policies. ECF No. [66-2] ¶ 2. Defendants do not sell their products from headquarters in Wisconsin nor through direct marketing, bank affiliations, or the internet. *Id.* ¶ 4. Instead, Defendants use a "General Agency" sales model in which an independent contractor known as a "General Agent" operates a local field sales office. *Id.* ¶¶ 5–7. The general agent, in turn, enters into contractual arrangements with individual sales agents termed "Special Agents" or "Financial Representatives." *Id.* As an alternative to this model, under certain circumstances, the Northwestern may appoint a representative of the company to "operate the local agency" as a "cashiership." *Id.* ¶¶ 8–9; *see* ECF No. [66-15] at 6. Whether the local field office is operated by a general agent or as a cashiership, financial representatives are generally responsible for developing their own client lists and soliciting applications for insurance. ECF No. [66-15] at 2.

From 1996 to 2016, Plaintiff was a Northwestern financial representative. In early 2010, Plaintiff entered into a superseding "Full-Time Special or Soliciting Agent's Contract" effective February 1, 2010 with the Seery Financial Group LLC, a general agency owned and operated by general agent Robert Seery ("the Seery Agency"). *Id.* ¶ 11. Plaintiff also entered into an "Amendment" to that agreement on January 22, 2010. *See* ECF No. [66-15], [72-2] (together, with the Full-Time Special or Soliciting Agent's Contract, "the Walfish Contract"). The Walfish Contract includes the following provisions:

> **4. Relationship** – Agent shall be an independent contractor and nothing herein shall be construed to make Agent an employee of the Company [Northwestern], General Agent [Robert Seery], or First Party [Seery Agency]. Agent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place and manner of solicitation, but the Company from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of action of Agent.

---

[1] The Court notes that Plaintiff has filed a separate lawsuit against the Defendants here and Northwestern employee Matthew Holleran in the Southern District of New York for wrongful termination under the New Jersey Law Against Discrimination, N.J. Stat. § 10:5-12(*l*). *See Walfish v. Holleran et al.*, Civil Case No. 7:16-cv-05534-KMK (S.D.N.Y). Although the record before the Court contains substantial information that relates to the wrongful termination claim, the Court only recounts those facts relevant to the claim asserted here.

…

**6. Exclusive Dealing –** (a) the Agent agrees to submit to the Company for approval all Applications secured by him/her for life insurance, annuity contracts or disability income insurance policies, except Applications with respect to persons who are then insured by the Company to the limit which it will issue on them or who are otherwise not acceptable for insurance by the Company or who have been found by the Company to be insurable only at higher than standard premium rates which are unacceptable to the applicants. However, this provision shall not apply to Applications for Section 79 group term life insurance, individual or group health insurance, credit life, liability, fidelity, surety and travel accident insurance or mutual fund shares. Agent is deemed to be a full-time life insurance salesperson and is expected to concentrate his/her sales efforts on behalf of the Company.

…

**8. General Duties –** Agent shall solicit Applications within the territory, and shall procure the issuance of life insurance policies and annuity contracts in an aggregate amount and on a number of lives satisfactory to the First Party and at least equal to the minimum requirements established by Company for licensure. He shall collect the initial premiums on such policies and contracts. . . .[2]

…

**13. Expenses –** Agent shall pay all expenses incurred by him in the performance of this agreement.

**14. Conduct –** Agent shall comply with all applicable laws and regulations and shall so conduct himself as not to affect adversely the business, good standing or reputation of himself, the First Party, or the Company.

ECF No. [66-15] at 2–3. The Walfish Contract also sets forth the terms for payment of Plaintiff's commissions and for termination of the agreement. *Id.*

From 2010 to 2016 (the "Relevant Time Period"), Plaintiff sold insurance under this contract and filed taxes as a sole proprietorship called "Fred Walfish Insurance." ECF No.

---

[2] The language of paragraph 6 and 8 as reprinted here reflects the changes agreed to by Plaintiff, Seery Agency, and Northwestern under the Amendment.

[66-2] ¶ 14; 87–92; *see also* ECF Nos. [61-10], [61-13].[3] During this time, he characterized himself as an "outside salesman" who sold both Northwestern policies and policies of approximately twenty other companies to "[his] clients." Walfish Tr. at 30–32, 35–36, 96, 103. Some years Plaintiff received significantly more income from non-Northwestern products, and in some years, he received a larger percentage of his income from Northwestern products. ECF No. [66-2] ¶¶ 52–56; 87–90; *see also* [61-10], [61-13]. However, the record reflects that his Northwestern commissions comprised no more than one-third of Plaintiff's overall annual commission compensation during the Relevant Time Period. ECF No. [66-2] ¶ 55.

Plaintiff testified that within his assigned territory he had no restrictions on which clients he pursued or for which clients he submitted applications. *Id.* 35–36; *see also* ECF No. [66-2] ¶ 28. Rather, Plaintiff was required to develop his own prospects and client lists, and no clients were provided to him by Northwestern. ECF No. [66-2] ¶ 29. Plaintiff testified that Northwestern approved his clients' applications before issuing insurance products and that Plaintiff was contractually required to recommend Northwestern products over a similar competitor's product, unless the competitor's product was in the client's best interest. *Id.* ¶ 30. At times during the Relevant Time Period, a significant portion of Plaintiff's sales were for products in which Northwestern had no offerings, such as health insurance policies. Walfish Tr. at 829–30.

Plaintiff was expected to meet certain minimum sales levels. ECF No. [66-2] ¶ 87. Both Plaintiff and other deposed witnesses from Northwestern testified that failure to meet those minimums would not necessarily result in termination of a financial representative's contract, but rather could also result in a waiver of the minimums, a probationary period, or a monetary penalty. *Id.* ¶ 87; *see also* [61-16] at *passim* and Walfish Tr. at 229–31, 241. Plaintiff further testified that he was required to keep certain records regarding the suitability of his product recommendations; to maintain his work email signature, business cards, and voicemail with accurate information; to complete certain continuing education and compliance requirements; to attend an annual compliance review and annual staff meeting; and to comply with a "Field Compliance Manual." *Id.* ¶¶ 22, 28, 34–35.

During the Relevant Time Period, Plaintiff rented an office from either the Seery Agency or its successor cashiership. Plaintiff testified that "I can't give you any kind of a routine that I kept in terms of being in and out of the office," spent "plenty" of days out of the office, had "not a clue" how much time he spent in his rented space. Walfish Tr. at 94, 96–101. The parties agree that Plaintiff determined his own schedule, scheduled his own appointments, and maintained his own calendar. ECF No. [66-2] ¶ 40. Plaintiff testified that he generally met with clients outside of the office, usually at their homes or place of

---

[3] In 2014, Northwestern terminated its relationship with Robert Seery and the Seery Agency was operated as a cashiership by a Northwestern employee Matthew Holleran. Plaintiff continued selling insurance under the Walfish Contract and filing taxes as "Fred Walfish Insurance" from 2014 to 2016 when his association with Northwestern ended.

4

business, and often worked from home. ECF No. [66-2] ¶¶ 30–34. His tax returns during the Relevant Time Period reflect tens of thousands of dollars in deductions on his Form 1040 Schedule C for "Fred Walfish Insurance" for rent, office supplies, mileage, dining expenses, telephone costs, repairs and maintenance. *See* ECF Nos. [61-10], [61-13]. Plaintiff testified that was impossible to separate expenses he had from selling Northwestern products from the overall operation of Fred Walfish Insurance. ECF No. [66-2] at 24.

Each month, Defendants generated statements which reflected the commissions from the products financial representatives sold. *See, e.g.*, Walfish Tr. at 561–62. Defendants then transmitted all gross commissions to the general agent for that month, and the agency in turn recorded these commissions on an internal ledger system for each financial representative. ECF No. [66-2] ¶ 72. Plaintiff's commissions and expenses, including rent, office supplies, and licensing fees, as well as his "expense override," that is, an additional percentage provided by the general agency based on Plaintiff's sales, were reflected on his internal ledger account. ECF No. [66-2] ¶ 64, 78. Plaintiff testified that he understood that these positive and negative credits were reflected on his account, and for his twenty-year association with Northwestern Plaintiff was paid based on the balance as reflected in this account. *Id.* ¶¶ 64–69, 74; Walfish Tr. at 105, 77–85, 96–100. Plaintiff took deductions on his tax returns for the expenses recorded in the account as unreimbursed business expenses. ECF No. [66-2] ¶ 77. During the Relevant Time Period Plaintiff was compensated based on this system and made his minimum sales requirements each year from 1996 to 2014. In 2015, Plaintiff missed his minimums. Walfish Tr. at 625–26.

By June 2016 Plaintiff was no longer associated with Northwestern. While the parties disagree regarding the reasons that Plaintiff's contract terminated, Plaintiff testified at his deposition that after his association with Northwestern Mutual concluded, he continued to sell insurance to his clients and operate Fred Walfish Insurance, but no longer sold Northwestern products. ECF No. [66-2] ¶ 63; Walfish Tr. at 43-56, 69–70.

## II. PROCEDURAL HISTORY

Based on these facts, on August 15, 2016, Plaintiff filed his one-count putative class action complaint alleging violations of the NJWPL. ECF No. [1]. Plaintiff alleges that despite his contractual classification as an independent contractor, Defendants actually exercised substantial control over the performance of his work requiring him to be classified as an "employee" and entitling him to certain wage protections found in the NJWPL. Plaintiff alleges the following control over his work: (1) minimum earnings requirements and control over compensation schedule, (2) exclusive dealing which required Plaintiff to preference Northwestern polices, (3) requirements regarding approval for outside or consulting work, (4) requirements regarding content of marketing material, (5) requirements regarding the maintenance of records and adherence to compliance guidance, and (6) various requirements regarding electronic device access, use of email, and retention of electronic documents. *Id.* ¶¶ 24–56. Plaintiff brings his NJWPL claim on behalf of himself and all persons who worked in New Jersey as insurance agents, special

5

agents, soliciting agents, registered representatives financial representatives . . . for Defendants at any time on or after [August 15, 2010]." *Id.* ¶ 10. Defendant answered, ECF No. [12], and discovery ensued. On September 13, 2018, The Honorable Mark Falk, U.S.M.J., granted Defendants permission to move for summary judgment before Plaintiff moved for class certification. The Motions followed. ECF No. [61] & [66].

In their moving brief, Defendants make three general arguments in favor of their position that Plaintiff is an "independent contractor" and not an "employee" under the NJWPL, and therefore not entitled to its protections. Specifically Defendants argue (1) that the Court should read the NJWPL to incorporate an enumerated exclusion for insurance agents found in the New Jersey Unemployment Compensation Act ("NJUCA"); (2) that the undisputed facts demonstrate Plaintiff's relationship with Defendants meets the "ABC Test" for classification as an independent contractor applicable under New Jersey law; and (3) even if the Court were to find that Plaintiff is an employee, the alleged "deductions" from his compensation are actually lawful adjustments applied based on an agreed-upon compensation formula. *See* ECF No. [61-1].

Plaintiff in his cross-motion for partial summary judgment argues that Defendants have failed to meet their burden on summary judgment that Plaintiff is exempted from the NJWPL based on his status an insurance agent or under the ABC Test. *See* ECF No. [66-1]. Plaintiff further argues that because he is protected as an "employee" under the NJWPL, Plaintiff is entitled to partial summary judgment as to liability since the compensation methodology used by Defendants violates that statute. *Id.*

In their joint reply-opposition as required under Local Rules, Defendants reiterate the arguments made in their opening brief, and in support of their argument that Defendants' minimum production standards do not demonstrate that Defendants "exercised control" under the ABC Test, attach a 2014 New Jersey Department of Labor determination which found that a different employee of Defendants did not meet the ABC Test. Because Plaintiff requested leave to respond to this document, the Court granted leave to file a sur-reply. ECF No. [76]. In that brief, Plaintiff argues that the DOL's determination is not binding, includes insufficient detail, and, even considering the detail provided, is distinguishable from this case. ECF No. [80].

### III. LEGAL STANDARD

Summary Judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if its determination might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court views the facts in the light most favorable to the nonmovant and all reasonable inferences must be drawn in the nonmovant's favor. *Scott v. Harris*, 550 U.S. 372, (2007); *Green v. New Jersey State Police*, 246 F. App'x 158, 159 (3d Cir. 2007). Matters of credibility are left to the jury. *Josey v. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993).

The moving party bears the burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. If the moving party carries this initial burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal quotation marks omitted)).

"The standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Appelmans v. Philadelpia*, 826 F.2d 214, 216 (3d Cir. 1987). "Such motions 'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

## IV. ANALYSIS

Because the Court holds that the undisputed facts support a finding that Defendants have met their burden on each of the three requirements of the ABC Test, the Court need not address Defendants' statutory argument regarding the incorporation of the NJUCA into the NJWPL nor Defendants' argument regarding Plaintiff's consent to the "deductions" he claims were impermissible under New Jersey law. Accordingly, the Court first sets forth the ABC Test applicable to NJWPL claims in this District and then addresses each prong of that test in turn.

### A. The ABC Test

To determine whether an individual is an employee or an independent contractor under the NJWPL, the district court must apply the ABC Test. *Hargrove v. Sleepy's, LLC*, 220 N.J. 289, 295 (2015) (answering certified question from the Third Circuit: "Under New Jersey law, which test should a court apply to determine a plaintiff's employment status for purposes of the New Jersey Wage Payment Law, N.J.S.A. § 34:11–4.1, et seq., and the New Jersey Wage and Hour Law, N.J.S.A. § 34:11–56a, et seq.?"); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

The ABC Test presumes an individual is an employee unless the employer can make a showing that:

(A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

*Hargrove v. Sleepy's, LLC*, 612 F. App'x 116, 117–19 (3d Cir. 2015) (quoting *Hargrove*, 220 N.J. at 302). "Part A is referred to as the 'control test,' Part B as the 'course-of-business or location-of-work test,' and Part C as the 'independent-business test.'" *Veras v. Interglobo N. Am., Inc.*, No. A-3313-16T1, 2018 WL 5316459, at *4 (N.J. Super. Ct. App. Div. Oct. 29, 2018) (*Phila. Newspapers, Inc. v. Bd. of Review*, 397 N.J. Super. 309, 320, 937 A.2d 318 (App. Div. 2007)). Under this test if the employer fails to demonstrate that all three parts are met, the individual is an employee under the NJWPL. *Id.*

To satisfy the "control" prong, "the employer must show that it neither exercised control over the worker, nor had the ability to exercise control in terms of the completion of the work." *Hargrove, LLC*, 220 N.J. at 305 (citations omitted). In other words, an "independent contractor one who renders services but retains control over the manner in which those services are performed, agreeing only to accomplish results." *Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor*, 125 N.J. 567, 582 (1991). While under this prong "it is not necessary that the employer control every aspect of the worker's trade," in the context of insurance agents or other highly regulated industries, Courts have found that requirements to comply with applicable laws, regulatory frameworks, or professionalism rules alone are insufficient to meet this "control prong." *See Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 108 (D. Mass. 2015), *Chamberlain v. Securian Fin. Grp., Inc.*, 180 F. Supp. 3d 381, 393 (W.D.N.C. 2016).

Under the "course-of-business or location-of-work" prong, the employer must demonstrate either that the individual performed work distinct from the entity or performed at some other location. *Hargrove*, 220 N.J. at 305 (citing N.J.S.A. 43:21–19(i)(6)(B)); *see also Trauma Nurses, Inc. v. Bd. of Review, New Jersey Dep't of Labor*, 242 N.J. Super. 135, 147, 576 A.2d 285, 292 (App. Div. 1990) (finding Part B satisfied since agency was "in the business of matching a nurse with the personnel needs of a hospital" but not "undertaking the provision of health care services" and nurses did not provide any services at the agency's office).

For the "independent-business" prong, the court examines whether the plaintiff's "enterprise . . . can continue to exist independently of and apart from the particular service relationship. The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." *Carpet Remnant*, 125 N.J. at 585 (citations omitted). This prong is satisfied "when an individual has a profession that will plainly persist despite

8

the termination of the challenged relationship." *Id.* This prong is not satisfied when, upon termination of the relationship, the plaintiff "joins 'the ranks of the unemployed . . . .' " *Id.* (citations omitted).

### B. Part A: Control

Defendants have satisfied the "control" prong because Plaintiff was both contractually and actually free from control. First, Plaintiff's employment contract explicitly defines his relationship with Seery Agency and the cashiership as one of an "independent contractor" and notes that the "[a]gent shall be free to exercise his own judgment as to the persons from whom he will solicit Applications and the time, place, and manner of solicitation, but [Northwestern] from time to time may adopt regulations respecting the conduct of the business covered hereby, not interfering with such freedom of the action of Agent." ECF No. [61-7] ¶ 4. This provision is sufficient to establish that Plaintiff was "free from control or direction over the performance of such service . . . under his contract." *Hargrove*, 612 F. App'x at 117–19.

As to actual control, Plaintiff testified that Defendants exerted little control over his work. Plaintiff was not required to follow up with any particular client leads and was never directed what to sell or to whom to sell it. He could perform such services at any time of day, at any location. Plaintiff testified that, while he had an annual compliance meeting with the general agency's management, he considered any feedback at such meeting mere "suggestions," and declined numerous requests to keep certain records or update certain marketing material including business cards, letterhead, and his voicemail greeting. In sum, he retained control over the time, place, and manner of the services he provided, and only agreed on the result: the sale of a minimum amount of Defendants' products. *See Carpet Remnant*, 125 N.J. at 582; *Trauma Nurses*, 242 N.J. Super. at144–44.

Plaintiff urges the Court to find the he was not "free from control or direction" because he was subject to rules promulgated by Defendants' in response to regulatory guidance and state and federal law. In support, Plaintiff cites to evidence that he was required to keep current and accurate records, provide accurate marketing materials to his clients, maintain proper licensing, submit to compliance reviews, make electronic devices are available for inspection, use company email accounts, and seek approval for outside business activities. Plaintiff argues that these requirements are sufficient to demonstrate that Northwestern directed and controlled his insurance business. While the parties do not dispute the existence of these rules which undoubtably impacted Plaintiff's work, the documents supplied by Plaintiff in support of his motion demonstrate that each requirement is based on applicable state law, federal law, or agency regulations. *See, including but not limited to* ECF No. [66-18] (filed under seal), Field Compliance Manual at §§ 1002.16.2.1; 1002.31.4, 1003.49.4, 1003.86.4, 1003.87.4; 1003.90.4; 1003.99.4 1004.29.1; 1005.5.4, 1005.8.4, 1006.24.4, 1012.24.4; 1015.20.1, 1015.20.4, 1015.22.1, 1015.22.4, 1019.8.4, 1019.51.4; 1019.72.4; 1019.100.4; 1020.8.4, 1022.17.4, 1023.6.4 (noting in the "Policy Statement" and "Rationale" sections the state, federal, or agency regulations that provide

9

the basis for the provision); *see also* ECF No. [72-1] (chart prepared by Defendants comparing alleged controls and their regulatory corollary).

The Court is unwilling to find that, by promulgating certain rules to ensure regulatory compliance, Northwestern exercised control and direction sufficient to fail the Part A of the ABC test. Were that so, any business operating in a regulated industry would necessarily no longer be able hire workers under an independent contractor relationship unless it was willing to risk regulatory non-compliance. *Cf. Santangelo v. New York Life Ins. Co.*, No. CIV.A. 12-11295-NMG, 2014 WL 3896323, at *8 (D. Mass. Aug. 7, 2014), aff'd, 785 F.3d 65 (1st Cir. 2015); *Chamberlain*, 180 F. Supp. 3d at 393; *Lockett v. Allstate Ins. Co.*, 364 F. Supp. 2d 1368, 1377 (M.D. Ga. 2005). While the Court notes the lack of case law from this District analyzing the applicability of Part A in the insurance industry, the Court agrees with other district courts examining the impact of regulatory or professional requirements on independent contractors that such regulations do not establish control. *See, e.g.*, *Trauma Nurses*, 242 N.J. Super. at 135 (finding trauma nurses were independent contractors although each nurse was required to maintain licensing, malpractice insurance, pass a "skills checklist," and follow hospital regulations).

Accordingly, as a matter of law in analyzing the undisputed facts under Part A, the Court finds that it need not consider those policies set forth by Defendants for the purpose of regulatory compliance. For those remaining policies, the undisputed facts demonstrate that Defendants did not exercise control or direction over Plaintiff's services. Plaintiff argues that the existence of sales minimums alone requires a finding of control, citing *Schomp v. Fuller Brush Co.*, 124 N.J.L. 487, 490, 12 A.2d 702, 704 (Sup. Ct. 1940), *aff'd*, 126 N.J.L. 368, 19 A.2d 780 (1941) (finding control when company proscribed sales techniques and terminated sales persons who failed to make minimums). However, while Plaintiff was expected to make certain sales minimums, he also testified that failure to meet these minimums would not necessarily result in termination, but rather could result in waiver of the requirement, a probationary period, or a monetary penalty. A sales incentive structure, and retention of the contractual right to modify that structure, is insufficient to demonstrate control. *Lockett*, 364 F. Supp. 2d at 1368. Rather, such "goals and objectives that were articulated for Plaintiff are evidence of Defendant[s'] right to control minimum output, which is distinct from the right to control the manner and means by which such minimum output is achieved." *Id.* (finding insurance sales minimums did not constitute control for purposes of determining independent contractor status under Title VII); *E.E.O.C. v. Catholic Knights Ins. Soc.*, 915 F. Supp. 25, 31 (N.D. Ill. 1996) (same).

Moreover, the Court finds that Plaintiff's argument that Defendants exercised control through the contractual exclusive dealing provision falls flat. ECF No. [66-1]. First, instead of quoting to the operative exclusive dealing language that governs the relationship between the parties in Section 6(a) of the Walfish Contract, Plaintiff mounts its control argument by citing to a superseded provision of the Walfish Contract. Moreover, even if Plaintiff had relied on the proper provision, the record reflects that Plaintiff derived significant income from non-Northwestern business over the relevant time

period and, to the extent the operative Section 6(a) may be read to preclude certain business dealings, Plaintiff's course of conduct demonstrates otherwise.

Finally, beyond the regulatory requirements, sales minimums, and the exclusive dealing provisions already addressed, the remaining alleged "controls"—such as an annual staff meeting—are so *de minimis* that they cannot satisfy Part A. Accordingly, Defendants have met their burden under the "control" prong of the ABC Test.

### C. Part B: Course-of-Business or Location-of-Work

Defendants have also met their burden under Part B under either of the alternative methods of satisfying that prong. As to the course-of-business method, the uncontroverted testimony demonstrates that Northwestern does not "sell" insurance. ECF No. [66-2] ¶ 2. Plaintiff argues that because Chief Operating Officer Daniel A. Riedl testified that Northwestern "sells" insurance, that Defendant fails on Part B. However, the Court has reviewed Mr. Riedl's deposition and he did not so testify. Rather, the exchange proceeded as follows:

> Q. And just to go over this very quickly, I think it's well-known and not contested, Northwestern Mutual Life Insurance Company is a company that sells life insurance?
>
> A. Correct
>
> ...
>
> Q. NML generally sells its product through a series of offices throughout the country; is that correct?
>
> A. I would not put it that way. Northwestern Mutual sells its products through a career agent distribution system.
>
> Q. What do you understand that distribution system to be?
>
> A. It's a network of independent contractors, general accounts. We call them managing partners.
>
> ...
>
> Q. And the managing partners are typically treated by Northwestern as independent contractors?
>
> A. The managing partners are independent contractors.
>
> Q. And they, in turn, contract with financial representatives to sell Northwestern product?
>
> A. Correct

Riedl Tr. 5-8.

Moreover, even if the Court were to find that this testimony creates a genuine issue of material fact as to whether Northwestern "sells" insurance, Defendants have still met

11

their burden under the location-of-work method of fulfilling Part B. There is no evidence in the record that Plaintiff spent time at Northwestern's place of business in Wisconsin. Nor is there any evidence that he regularly reported to any Northwestern office. Rather, Plaintiff testified that he had no regular hours and sold insurance for Northwestern and approximately twenty other companies from the Seery Agency, from his own home, and from the homes or offices of his clients. Under the ABC Test, these facts establish that Plaintiff's sale of insurance products was outside Defendants' normal course of business and that he performed such services outside of Northwestern's place of business. *See Ruggiero*, 137 F. Supp. 3d at 108; *Carpet Remnant*, 125 N.J. at 582–84 (1991).

### D. Part C: Independent Business

In his moving brief, Plaintiff does not contest Defendants' argument that they have met the independent business requirement of Part C. ECF No. [66-1] at 34. Even assuming that Plaintiff has not waived this argument, the Court finds that Defendants have met their burden here as well. From at least 2010 to 2016, Plaintiff operated a business, Fred Walfish Insurance as a sole proprietor, claiming income from at least twenty different insurance companies and submitting a Schedule C for tax deductible expenses related to the operation of that business as an independent contractor. ECF No. [66-2] ¶ 63. After termination of his Northwestern association, Fred Walfish Insurance continued "to exist independently of and apart from the particular service relationship," and Plaintiff continued selling insurance to his clients. *Hargrove*, 220 N.J. at 305 (citing N.J.S.A. § 43:21–19(i)(6)(C)); Walfish Tr. at 43-56, 69-70. That is sufficient to fulfill Part C of the ABC Test.

### E. Plaintiff Is an Independent Contractor

The undisputed facts demonstrate that Plaintiff was free from control and direction in the sale of their insurance products, performed his services outside the normal place and course of Defendants' business, and continued Fred Walfish Insurance after the termination of his association with Defendants. The Court thus finds that Plaintiff was an independent contractor. Because the NJWPL does not apply independent contractors, Plaintiff's motion must be denied and Defendants' motion must be granted. *Hargrove*, 220 N.J. at 304.

### V. CONCLUSION

For the reasons cited above, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Partial Summary Judgment is **DENIED**. An appropriate order will follow.

Dated: May 6, 2019

*/s/ William J. Martini*
**WILLIAM J. MARTINI, U.S.D.J.**